UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT PANN, #254048,

           Petitioner,

                                 CASE NO. 5:08-CV-13806
v.                             HONORABLE JOHN CORBETT O'MEARA

MILLICENT WARREN,

           Respondent.

_____/

**OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS
CORPUS AND DENYING A CERTIFICATE OF APPEALABILITY**

**I.      Introduction**

      This is a habeas case brought pursuant to 28 U.S.C. § 2254.  Michigan prisoner Robert William Pann ("Petitioner") was convicted of first-degree premeditated murder, MICH. COMP. LAWS § 750.316(1)(a), and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Macomb County Circuit Court in 2001.  He was sentenced to life imprisonment without the possibility of parole and a consecutive term of two years imprisonment.  In his pleadings, Petitioner raises claims concerning the admission of certain evidence, the sufficiency of the evidence, the conduct of the prosecutor, and the effectiveness of trial counsel.  For the reasons set forth herein, the Court denies the petition for a writ of habeas corpus and denies a certificate of appealability.

**II.     Facts and Procedural History**

      Petitioner's convictions arise from the shooting death of Bernice Gray, his estranged girlfriend and the mother of his daughter, in St. Claire Shores, Macomb County, Michigan on

December 26, 1991.  Petitioner was not tried until January of 2001.  The prosecution's theory at trial was that Petitioner shot Bernice in her car early that morning after she took their daughter to daycare and that he buried her body, which has never been found.  The prosecution claimed that Petitioner shot Bernice because she rejected his marriage proposal and wanted to date other men.  Petitioner challenged the circumstantial nature of the prosecution's case  and denied committing the crime.

The prosecution presented several witnesses at trial.  Bernice Gray's father, Thomas Gray, testified that he last saw Bernice on December 25, 1991.  He also testified that he bailed Petitioner out of jail in late 1989 or early 1990 at Bernice's request.  Petitioner had been arrested for failure to pay child support as to his first marriage and was upset.  Petitioner told Gray that he knew a man who killed his old lady, disposed of her body, and got away with it, which he described as "no body, no crime, the perfect crime."  Gray also recalled seeing two pistols at Petitioner's house prior to December, 1991, but did not know their caliber.

Thomas Gray's long-term girlfriend, Sandra Dzwonik, testified that she first met Petitioner in November, 1988.  She helped Bernice and her daughter move out of Petitioner's home on December 12 or December 13, 1991.  When she saw Petitioner at a family gathering on December 25, 1991, he was unhappy and told her that Bernice had turned down his marriage proposal and wanted to date other men.

Gary Chupailo, who resided on Florence Street two houses from Gordon Street (near Bernice's daycare provider) in St. Clair Shores, testified that he awoke at about 6:00 a.m. on December 26, 1991 to get ready for work.  He heard a sound like a gunshot coming from the direction of Gordon Street around 6:30 a.m. or 6:35 a.m.  He contacted the police a few days later after seeing a flyer about Bernice Gray's disappearance.

2

Kathy Petrik, a supervisor at Henry Ford Healthcare in Southfield, testified that Bernice Gray was a conscientious work and usually arrived early for work. Bernice was scheduled to work at 8:00 a.m. on December 26, 1991, but never arrived that day. Petrik telephoned Petitioner's home and left a message. Petitioner returned her call at 8:34 a.m. and told her that Bernice had stayed at her mother's house and might have overslept. He said that he did not know her whereabouts. Petrik then telephoned Jean Ulmer's home to report that Bernice had not appeared for work.

Bernice's best friend, Monique Diederich, testified that Bernice and Petitioner began dating in 1987, moved in together at Petitioner's home on Alexander Street in St. Clair Shores in late 1987 or early 1988, and had a daughter in 1990. In December, 1991, Bernice became interested in another man, moved out of Petitioner's home, and said that her parents were setting up a house for her and her brother. Diederich also testified that Bernice called her between 8:00 p.m. and 9:00 p.m. on December 24, 1991 and told her that Petitioner had proposed to her and given her a ring, but she had declined the marriage proposal. Petitioner then threatened to kill her and said that such action would solve any child custody issues. Diederich spoke to Bernice again around 10:00 p.m. on December 25, 1991 about their plans to attend a concert on New Years' Eve. Bernice told her that Petitioner would join them at the concert. Diederich called Bernice's office at 11:00 a.m. on December 26, 1991 and learned that Bernice had not arrived at work and her family did not know her whereabouts. Diederich called Bernice's mother, Jean Ulmer, and went to Ulmer's home after work. Petitioner arrived sometime thereafter, was greeted with suspicion, and left after five minutes. Diederich testified that she has not seen or heard from Bernice since their conversation on December 25, 1991. Diederich did not believe that Bernice would leave her daughter.

Robert Reich testified that he worked for Petitioner in 1991 doing basement waterproofing

3

and cement work.  Petitioner had a backhoe with a front-end loader, but it was stolen in November, 1991.  Petitioner kept several vehicles at a storage yard and owned rental properties on the east side of Detroit in 1991.  Reich testified that Petitioner picked him up at his home in Warren around 9:30 a.m. on December 26, 1991.  This was unusual because Reich normally met Petitioner at the yard where his equipment was stored.  He and Petitioner went to Petitioner's home.  Jean Ulmer arrived, was upset, and said that Bernice was missing.  Petitioner did not go look for her.  Reich and Petitioner then drove to an office building to repair a basement wall crack.  Reich said that the job could have been performed by one person, but he and Petitioner shared the work and it took three or four hours.  Petitioner drove him home at 3:00 or 3:30 p.m.  Reich also testified that he worked with Petitioner from 2:30 p.m. to 6:30 or 7:00 p.m. on December 27, 1991.  They did a roofing job and then stopped at some of his rental houses.

The parties stipulated that Bernice Gray's car, a Pontiac 6000, was found on Eastlawn Street near Mack in Detroit, Michigan at 12:45 p.m. on December 30, 1991, that blood was found in the car, that DNA testing showed it to be Bernice's blood, and that two shell casings and a spent bullet were recovered from the car.

Dr. Werner Spitz, the former Wayne County medical examiner, testified that he examined Bernice Gray's car in January, 1992 and prepared a report dated February 6, 1992.  He observed a large pool of blood on the passenger's seat but none on the driver's seat, blood on the top of the steering wheel, and blood splatters on the driver's side door window, the windshield, and the driver's side sun visor.  He also found two shell casings and a spent bullet in the car.  It was Dr. Spitz's opinion that Bernice was shot in the head while sitting in the driver's seat, that two shots were fired with one bullet remaining in the body, and that the shooter was either in the car or outside

4

the car with the gun hand inside the car.  He believed that Bernice dropped forward onto the steering and either fell or was pushed over onto the passenger seat.  He testified that she would have been brain dead upon impact and that her heart would have stopped beating within five to ten minutes.

A Macomb County Probate Court order by Judge James Nowicki dated January 25, 1995 declaring the death of Bernice Gray was admitted into evidence.  The court found that Bernice Gray was killed or may be presumed to have died by accident or disaster on Gordon Street near Florence Street in St. Clair Shores at or about 6:40 a.m. on December 26, 1991.  The order provided that an intentional homicide was within the definition of an accident or disaster.

Candace Fulgenzi-Kingston testified that she was living with her family on Linwood Street in Roseville, Michigan on April 19, 1986.  At about 9:30 p.m., she saw a black car like a Trans Am parked across the street and heard a woman screaming for help and saying he's going to kill me.  She also heard a male voice making threats and saying, "I'm going to kill you and you're going to die tonight."  In the middle of the threats, she heard the man tell the woman to "suck his dick," heard crying, and a few minutes later heard the man yell, "you bit me, you bitch, you bit me."  The threats continued.  Fulgenzi-Kingston called 911 and reported the incident.  She saw a police car arrive a few minutes later.  When the officer parked and exited his car, the couple's car sped away.  The officer followed the car.

Karim Charara, the manager at Merksamer Jewelers at Lakeside Mall in Sterling Heights, testified that Petitioner came to the store alone at about 9:30 a.m. on December 26, 1991 to return an engagement ring that he had purchased on December 19, 1991.  A store video showed that Petitioner was in the store at 9:42 a.m.  Charara said that he tried to save the sale, but Petitioner said that he wouldn't be needing the ring or the relationship wasn't going to work.  The jewelry store had

5

a 30-day return policy.  The ring cost $ 2,000.  Petitioner paid $500 toward the ring and financed

the remaining $1,500 at an 18% interest rate.  Charara further testified that Petitioner had tracked

dirt and mud on the store's carpet, which required vacuuming after he left the premises.

Roseville Police Officer John Naples testified that he responded to the assault call on April

19, 1996.  As he approached the car, an Iroq Camaro, he saw a man and another person in the car.

He then heard the words "no way" and the car took off.  He called in the license plate number and

followed the car.  He next observed the car in an accident on Gratiot Avenue south of Eleven Mile

Road.  Petitioner was the driver and his wife at that time, Maureen Pann, was the passenger.  She

had facial injuries.  Naples spoke to Maureen Pann at the hospital about 45 minutes later.  She told

him that Petitioner had tried to kill her, had tried to strangle her, and told her that she was going to

die.  Photographs of Maureen Pann taken after the incident were admitted into evidence.

Daycare provider Suzanne Miller testified that she operates a licensed daycare service from

her home on Gordon Street in St. Clair Shores, Michigan.  She provided child care for Bernice

Gray's and Petitioner's daughter, Stephanie Gray, from June 5, 1991 through December 26, 1991.

On December 26, 1991, Bernice brought Stephanie to her home between 6:20 a.m. and 6:25 a.m.

and said that she was going to work.  Bernice dropped Stephanie off near that same time five days

a week and picked her up around 4:00 p.m.  Petitioner was familiar with her home and had dropped

off or picked up Stephanie nine times during that six-month period.  On December 26, 1991, Miller

saw the headlights from Bernice's car pull into her driveway, but did not watch her leave.  Every

time Miller saw Bernice leave, she would head west on Gordon Street toward Harper Street.  Miller

testified that Bernice was at her home for five to ten minutes that morning.  Bernice's mother called

Miller shortly after 8:00 a.m. to inquire whether Stephanie was there because Bernice had not shown

up for work.  Miller never saw or spoke to Bernice again.  Bernice's mother and step-father picked up Stephanie that day.  Miller had expected Bernice to pick up Stephanie because Bernice had always informed her in advance if someone else would be doing so.  Petitioner did not inquire about Bernice or Stephanie that day.  Miller believed that Petitioner's house on Alexander Street was a quarter to a half-mile or three-quarters of a mile from her home.

Retired police officer Richard Ditchie, Petitioner's next-door neighbor, testified that he was home asleep in July or August of 1991 when Bernice Gray came to his door between 2:00 a.m. and 4:00 a.m.  She was nervous, upset, and "scantily clad," and asked to use the telephone to call her mother.  When Ditchie asked if she wanted him to call the police, she replied, "Not unless he comes out."  Bernice went back outside after using the telephone.  Ditchie went outside a few minutes later and gave her a t-shirt to wear.  Bernice subsequently got into a car in Petitioner's driveway and left the premises.  Ditchie did not see Petitioner that morning.

Jane Richards, a St. Clair Shores Housing Commission employee, testified that Bernice Gray completed a low-income housing application for herself and her daughter which was originally filed by her agency on October 19, 1990.  Richards subsequently received a call from Bernice indicating that she wanted to be put back on the waiting list due to domestic violence.  Richards amended the application on September 3, 1991 to reflect that Bernice was involuntarily displaced due to physical violence against a household member, which prioritized the application.  The application form was admitted into evidence.

A death certificate signed by Dr. Otto Hahne pronouncing that Bernice Gray died on December 26, 1991 at 6:40 a.m. was also admitted into evidence.

Gerald Lennox testified that Bernice Gray was his niece, his sister Jean Ulmer's daughter.

He testified that Bernice and her daughter were living with his sister in Warren in December, 1991 because he had moved out of Petitioner's home. Lennox believed that Bernice loved her daughter very much and would never voluntarily leave her. He last saw Bernice on December 25, 1991 at his sister's home. Petitioner and Stephanie Pann were also present. Lennox received a call from his sister around 4:00 p.m. on December 26, 1991 and his sister was concerned because Bernice had not shown up at work that day. Lennox said that he was concerned because Bernice doesn't normally miss work. Lennox went to his sister's home around 5:30 p.m. Jean had made several calls and had been unable to reach Petitioner that day. Petitioner returned her call at about 9:30 or 9:45 p.m. and came to the house 20 minutes later. Lennox testified that Petitioner looked "ragged out" and very tired with bloodshot eyes. Petitioner told Lennox that he had an emergency job at his accountant's office, that he couldn't get his heavy equipment in because the sidewalks would crack, and that he had to dig a nine-foot hole by hand. He then went shopping. As they walked into the kitchen, Petitioner said, "she's dead, I know she's dead." Lennox also discussed the family's efforts to locate Bernice and her car and said that Petitioner was not very helpful.

Dannyle Lennox testified that she is Gerald Lennox's daughter-in-law and knew Bernice Gray from family functions and from babysitting Stephanie Gray. She believed that Bernice had a good relationship with her daughter and would never voluntarily abandon her. Ms. Lennox learned that Bernice had not shown up for work and was missing on December 26, 1991. She went to Jean Ulmer's house that evening and was concerned because Petitioner was not there. When Petitioner arrived later, she thought that he looked very tired. She recalled him wearing a beige, tan down jacket. He said that he had done a job at his accountant's office and had to dig a nine-foot hole by hand because he could not use his equipment. He also said he went shopping. When Jean Ulmer

8

confronted Petitioner about possible threats he made against Bernice, he said that he only meant he would kidnap Stephanie to avoid a custody dispute. Ms. Lennox said that there was some suspicion about Petitioner. She did recall that he apologized for not coming to the house sooner, but said he didn't realize the seriousness of the situation. Ms. Lennox also testified that she, Petitioner, and other family members looked through boxes that Bernice had in the basement around 11:00 p.m. to check for bank records and other items. She saw Petitioner take a piece of paper from one box and put it in his pocket. When she left Jean Ulmer's home at 1:00 or 2:00 a.m., Petitioner was still there. Ms. Lennox was aware of the family's efforts to locate Bernice, but did not believe that Petitioner had done much other than distribute some flyers. She was aware that the family had put together a reward, but did not know if Petitioner had contributed to it.

St. Clair Shores Police Officer Bill Behrend testified that he prepared a missing person report concerning Bernice Gray at the request of her mother between 1:00 and 1:30 p.m. on December 26, 1991. He handled the matter in a normal fashion.

A portion of Petitioner's grand jury testimony, taken while he was represented by counsel on February 21, 1994, was read into the record. Petitioner stated that he proposed to Bernice Gray with an engagement ring on December 24, 1991, but she turned him down. He said that he expected a rejection because he had a bad attitude about women due to a previous divorce. Petitioner recalled being at Jean Ulmer's house for dinner on December 25, 1991. He was drinking and playing cards until he left around 12:30 or 1:00 a.m. After he and Bernice had words, he decided to leave before he jeopardized their New Years' Eve plans and slammed the door on his way out. Petitioner testified that he returned the ring to the jewelry store early on December 26, 1991 because he was not scheduled to be at his accountant's office to do a repair job until 11:00 a.m. He said that he

9

"went to the jewelers and went to Sabatini's and picked up [his] helper."  He further explained that he and his employee worked until about 3:30 p.m. to repair a wall crack inside the building with no outside work.  He denied telling Bernice's family that he had been digging all day and said that he told them that he had been jackhammering all day to fix a nine-foot crack.

Petitioner said that he learned Bernice was missing when her employer called him around 8:30 a.m. on December 26, 1991.  He was not concerned because he thought she might have stopped at someone's house, returned a Christmas gift, or done something else.  He told the caller that she had been living at her mother's house for a few weeks and provided that number.  Petitioner was suspicious that Bernice was seeing another man, but did not know for sure.  Petitioner testified that Bernice would normally leave for work around 6:00 or 6:30 a.m. to take their daughter to daycare and get to work between 7:00 and 8:00 a.m.  He denied seeing Bernice on December 26, 1991.  He did not know of any enemies that she had and did not believe that she would pick up a stranger. Petitioner testified that the daycare provider's home was one-half to three-quarters of a mile from his home.  He said that he had never walked there and denied being in that area at 11:00 p.m. on December 24, 1991.

Jean Ulmer (formerly Gray) testified that Bernice Gray was her daughter, that Stephanie Pann is her granddaughter, and that Petitioner is Stephanie's father.  Bernice lived with Petitioner and their daughter at his home on Alexander Street in St. Clair Shores, Michigan until early December, 1991 when Bernice and Stephanie moved into Ulmer's home in Warren.  Ulmer believed that Bernice would never voluntarily abandon her daughter.  Ulmer was aware that Bernice and Petitioner had some problems.  She recalled an incident early one morning in July or August, 1991 when she had to pick up Bernice, who was wearing very little clothing, because Petitioner had

10

thrown her out of the house.  Ulmer testified that she and Bernice were looking for a new home for Bernice in late 1991.  They toured a home with steel bars on the windows and Bernice said that she was going to need them.  Ulmer did not know of any strangers who threatened Bernice.  Ulmer testified that Bernice would never let a stranger into her car and that she was an excellent employee who was never late for work without calling in.  Ulmer thought that Petitioner was unhappy about Bernice's leaving his home and she knew that Bernice had rejected his marriage proposal.  Petitioner was at Ulmer's home on December 25, 1991 and was angry when he left between 11:00 and 11:30 p.m.

On December 26, 1991, Bernice left Ulmer's home around 6:00 a.m. to take Stephanie to daycare and go to work.  Ulmer has not seen Bernice since that morning.  Bernice left in her blue Pontiac 6000 and normally took I-696 to her office in Southfield, Michigan.  Ulmer's husband, Sandy, called her at work that morning and informed her that Bernice had not shown up for work.  Ulmer immediately left work, traced the route that Bernice would drive, and then went home.  She made many phone calls and then she and her husband went to Petitioner's home close to the afternoon.  Petitioner was there with his employee.  Petitioner said that he had to work and did help them look for Bernice.  She and her husband drove Bernice's route again, called hospitals and the police, went to Sue Miller's house to check on Stephanie, and then went to the police station to make missing person report before returned to Miller's house to pick up Stephanie at 3:30 p.m.  Ulmer made many calls to Petitioner that day, but he did not return her call until 9:45 p.m.  He apologized for not calling her sooner and said he was shopping.  He came to her house about 20 minutes later.  He was clean, but looked very tired.  He said that he had been working all day and then shopping.  When she commented on how tired he looked, Petitioner said that he had been digging all day, then

11

went into an entire explanation of the work he had done.  Ulmer said that her immediate response was, "oh God, he buried her."  Ulmer testified that they continued to look for Bernice, but were unsuccessful.  She was notified that Bernice's car was found at Eastlawn and Mack in Detroit, Michigan on December 30, 1991.  Petitioner had done work for her husband in that area.

Ulmer testified that she obtained custody of Stephanie after a court battle with Petitioner. Ulmer recalled speaking with Monique Diederich on December 27 or 28, 1991.  Diederich was crying and said that Bernice had told her that Petitioner had threatened to kill her.  She also said that Petitioner was going to go to court and fight her for Stephanie, and then he paused and said, "maybe I won't have to."  When Ulmer confronted Petitioner about the statement, he denied threatening to kill Bernice and said that he only meant he would kidnap Stephanie.

Ulmer recalled looking through boxes of Bernice's paperwork with Petitioner and family members on December 26, 1991.  While they were doing so, her husband noticed that Petitioner had taken a paper and put it in his pocket.  Petitioner spent the night at her house that evening.  When she asked him about the paper the next day, he showed it to her.  It was an affidavit of parentage signed by Petitioner and Bernice on March 26, 1990 stating that Petitioner was Stephanie's father. Petitioner filed the affidavit with the Macomb County Probate Court on December 30, 1991.  A copy of the document was admitted into evidence.

Ulmer testified that her ex-husband, Thomas Gray, hired a private detective after Bernice disappeared.  The detective did surveillance on Petitioner, but Ulmer did not know how long it lasted.  Ulmer recalled celebrating Christmas Eve in 1991 at her home with her husband, her son Earl, Bernice, and Stephanie, but not Petitioner.  A man named Don also came by to see Bernice. Petitioner came over on Christmas morning.  Her guests left for brunch with her ex-husband but

returned later that evening.  When Petitioner left abruptly, Ulmer asked Bernice what happened. Bernice told her that Petitioner said he would get her drunk or she would be drunk on New Years' Eve and would come home with him with the baby.  Bernice replied, "don't count on it."

Ulmer and her family believed that Petitioner did not participate enough in searching for Bernice after her disappearance.  She acknowledged that he did obtain a photograph of Bernice to use on flyers, contributed $20 for the flyers, and he and his family contributed $2,000 to $3,000 toward a missing person reward that she established.  Ulmer testified that Bernice had left and returned to Petitioner on more than one occasion during their relationship.  She also recalled Petitioner expressing his desire to move up north or into the countryside with Bernice and Stephanie and have Bernice quit her job and help her with his business.  Ulmer indicated that Bernice was a smoker and may have smoked Marlboro Lights at the time of her disappearance.  She confirmed that Petitioner spent the night at her house on December 26, 1991.  She also stated that she had never seen a gun at Petitioner's home.

Mary Grillo testified that she lives on Neiman Street, parallel to Gordon Street, in St. Clair Shores, Michigan.  While driving to pick up her daughter at about 11:15 p.m. on December 24, 1991, she saw a "suspicious" man standing in a driveway between Sue Miller's home and the nearby condominiums.  She described the man as being in his late 20s or 30 year old about six feet tall.  On her way back home, she saw the same man pacing back and forth across the street from Miller's home.  She returned home, then left again to pick up a prescription.  When she was returning home, she saw the man a third time on the corner of Gordon Street and Greater Mack Avenue.  He was behind a telephone or light pole and she saw him stand up from a kneeling position.  It was very bright at that location and she saw his face for about 10 seconds.  Grillo continued home.  As she

13

was locking up her house about 12:20 a.m., she saw him walking across the street going south on Neiman toward Eleven Mile Road. A few minutes later, she heard a car with a loud muffler start up and drive away. She mentioned the man to her husband that night, but did not contact the police. She reported the man to police two weeks later after she learned of Bernice Gray's disappearance. Grillo also testified that she identified Petitioner as the man she saw that night during a lineup at the county jail on March 6, 1993. Grillo said that she was "almost positive" about her identification and that Petitioner's appearance had changed over time. She indicated that in comparison to the man she saw that evening, Petitioner's hair was combed differently and that he looked a little heavier at the lineup and Petitioner was wearing glasses and looked a little heavier at trial.

Petitioner's wife, Maureen Pann, invoked her Fifth Amendment privilege against self-incrimination at trial and refused to testify. The trial court found her unavailable and allowed her prior testimony to be read into the record. The testimony was from Petitioner's May 1996 preliminary exam which was used at Petitioner's 1996 assault trial. During that proceeding, Maureen Pann testified that she and Petitioner were married on November 3, 1995. On April 19, 1996, she visited a male friend on Blair Street near Ten Mile Road in Roseville. She left his house around 9:30 p.m. As she was driving her Camaro to her grandmother's house, Petitioner sprung up from the back seat and began choking her. She pulled over on Linwood Street. Petitioner said, "I'm going to kill you. This is it. You are dead." He struck her with his fists and she begged him to stop, but he continued hitting her. Maureen thought that she might have passed out then because the next thing she remembered was the crash. She said that Petitioner had threatened her about three days before the incident. On cross-examination, Maureen indicated that she was drinking, she was mad, and she over-exaggerated the incident. Upon reflection, she did not believe that Petitioner was

trying to kill her.

St. Clair Shores Deputy Chief of Police Frank Troester testified that he had a conversation with Petitioner at the St. Clair Shores police station at 5:00 p.m. on April 13, 2000. Petitioner asked him who had "snitched" on him. Troester's interpretation of that comment was that at least two other people had knowledge of Petitioner's involvement in Bernice Gray's death and he did not know who had come forward with information. Troester's opinion was that Petitioner meant who told on him about the crime when he used the term "snitch." Based upon his experience and investigation of the crime, Troester believed that Bernice Gray was shot by someone she knew because a stranger would not have taken the body. He also believed that Petitioner would have had sufficient time to commit the crime and dispose of the body within the time frames established by the other witnesses and evidence presented at trial.

Petitioner did not testify at trial, but the defense presented several witnesses to counter the prosecution's case. Kerrie Miller, a former court reporter, testified that she was the court reporter in the Macomb County Probate Court proceeding involving Bernice Gray's death. She testified that Dr. Spitz, Gary Chupailo, Detective Tom Jenny, and Jean Gray (Ulmer) testified at that hearing. She confirmed that the transcripts showed that Gary Chupailo testified that he had a limited amount of experience with gunshots because he had gone hunting one time and heard some shots. She also confirmed that Chupailo testified that he heard a loud noise which was a loud fire cracker or gunshot coming from Gordon Street while warming his car at about 6:35 a.m. (on December 26, 2001).

Accountant Michael Borowiak testified that he accompanied Petitioner and his employee to the basement of his new office building to repair a nine-foot crack in the basement wall on December 26, 1991. He did not notice anything unusual about them that day. He confirmed that

15

the contract was for $225 and did not indicate any emergency, and that the job was done during the late morning and early afternoon.  Accountant Raymond Modad testified that he knew Petitioner from softball, became his accountant, and hired him to do the waterproofing work on December 26, 1991 so that he could move into his new office building.

Robert Hutchins, a Macomb County deputy sheriff, testified that he was in charge of the lineup conducted on March 6, 1993 which included Petitioner and five other men and was attended by Mary Grillo.  According to Hutchins' report, Mary Grillo said that Number 2 (Petitioner) looked similar to the person casing Sue Miller's home, but his hair was combed differently and he was heavier at the time of the lineup.  Hutchins confirmed that the lineup form stated that the Number 2 suspect was identified, but acknowledged that he did not mark either positive or negative on the lineup card as to any of the six individuals.  He believed that he just forgot to do so.

Gerald Gray, Bernice Gray's uncle, testified that he took missing person flyers to a Marathon gas station on Ten Mile Road and Mound Road on December 26, 1991.  He spoke to an attendant named Jeff Greggo and then spoke to police about that conversation.  Gray also took missing person flyers to a Total gas station at Eleven Mile Road and Little Mack Avenue on December 28, 1991.  He spoke to a female attendant.  He also saw Petitioner as he was exiting that gas station.  Gray asked him if he had questioned anyone or passed out flyers, and Petitioner said no and proceeded to pay for his gas.  Gray said that Petitioner did not seem concerned about Bernice's whereabouts.

Dr. Werner Spitz was recalled and testified that he could not determine what time Bernice Gray died without her body.

Criminal defense attorney Brian Legghio testified from his experience about the general unreliability of "jail house snitches" and the term "snitch."  It was his opinion that a "snitch" is just

someone who says something about you and that he would not attach any weight to the word.

Jeff Greggo testified that he was employed at a midnight wrecker driver at the Marathon gas station at Ten Mile Road and Mound Road in December, 1991 and that he normally got off work at 7:00 a.m.  He recalled that one of Bernice Gray's male family members came to the station on December 28, 1991 and asked to place a missing person poster on the window.  Greggo viewed the flyer and told the man that he thought the woman look familiar and had recently purchased two packs of Marlboro cigarettes at the gas station.  Greggo said that he may have seen the woman during the latter part of his shift two days earlier.  At trial, Greggo admitted that he could not recall an exact date or time that he saw the women who looked like Bernice Gray.  Greggo did not believe that he spoke to police about the matter at the time, but he recalled speaking to Lieutenant McFadzen shortly before trial and telling him that he wasn't sure of the facts due to the passage of time.

Detroit Police Officer William Niarhos testified that he arrested a man named Sylvester Brown on January 24, 1992 on Phillip Street about two miles from Eastlawn and Mack in Detroit, Michigan.  When Brown was taken into custody, the police took two items from his person, a knife and a torn greeting card that said "To Dad" and had "Bernice Gray" written on it.  Niarhos described Brown as a black male, 41 years old, five feet seven inches to five feet nine inches tall, and 165 pounds with a medium build.  Niarhos also testified that he was familiar with the area of Eastlawn near Mack, that the area was rundown with many vacant homes and lots, and that it would not be unusual for an abandoned car to go unnoticed for four days in the area.

Fraser Police Officer John Trinkwalder testified that he was formerly an evidence technician with the Roseville Police Department and that he inspected Maureen Pann's car at an impound lot on May 6, 1996.  Trinkwalder recalled that the car appeared to have been in a collision and believed

17

that it had been moving at a high rate of speed based upon the damage.  He testified that he had worked on at least 100 domestic violence cases during his career and believed that a significant amount of abused women return to their abusers.

Criminal defense attorney Henry Scharg testified that he attended the lineup involving Petitioner conducted at the Macomb County Jail on March 6, 1993.  After reviewing the lineup sheet, he recalled that Mary Grillo appeared at the lineup and identified Petitioner as the man she saw in her neighborhood.  Sharg's opinion was that Grillo's identification was very tentative, but the lineup was fair because he would have noted any problems.

Phillip Kidder, an investigator with the Macomb County Prosecutor's Office, testified that he was previously a detective with the St. Clair Shores Police Department.  On February 12, 1992, he took a call from Mary Grillo and took a message for Detective Tom Jenny.  The message contained a description of the man she saw in the area of Gordon and Mack at 11:00 p.m. on December 24, 1991.  She described the person as a tall white male, 30 years old, light jacket, gym shoes, black knit cap, and narrow nose.  She said that she got a good look at the guy.

Tom Jenny testified that he was a detective with the St. Clair Shores Police Department with 23 years of experience in 1991 and that he was assigned to the Bernice Gray investigation.  He and Detective Tom Pietzke were the first officers on the scene when Bernice's car was found on Eastlawn Street near Mack Avenue in Detroit around 12:45 p.m. on December 30, 1991.  Jenny testified that the car was unlocked, the keys were on the floor, and the driver's side window was down one and a half to two inches.  Two spent shell casings were on the front seat of the care and blood was visible on several surfaces of the car.  Bernice's wallet, with identification but no money, was found in the car, as were several boxes and a child car seat.  Marlboro Light cigarette debris was

18

found in the ashtray.

A Detroit police officer took photographs of the car, which was taken to the crime lab. Detective Jenny described the various photographs. Certain photographs showed boxes in the back seat of the car. A Michigan license plate, not registered to Bernice Gray or Petitioner, was found under some carpeting in the car, as was a large pool of blood. The radio face plate had been removed and was found on the floor behind the passenger seat of the car. No fingerprints were lifted from the car, which led Jenny to believe that the car had been wiped down. Jenny also discussed his investigation, including his contact with several witnesses and the different areas that were searched over the years. Jenny admitted that the police have not been able to locate Bernice Gray's body and that the debris from the jewelry store did not match debris at Petitioner's storage facility, but said he still believes she was buried on properties leased by Petitioner. Detective Jenny testified that he believes that Petitioner committed the crime on his own, but acknowledged that at the time of his 1994 grand jury testimony he believed that Petitioner may have had an accomplice who was the trigger man and helped dispose of the body.

On cross-examination, Detective Jenny testified that he had an opinion about when Bernice's car first appeared on Eastlawn Street near Mack in Detroit. He said that he believed that the car was at that location by 11:00 a.m. on December 26, 1991 because a man named Zarrick Butler who lived in the area informed him that he had seen the car at that time.. Jenny believed that Bernice was killed by someone she knew because a stranger would not take the time, effort, or risk to dispose of the body. He said that his investigation led him to believe that Petitioner was capable of committing the crime.

The prosecution presented a few rebuttal witnesses. Jean Ulmer testified that her daughter

19

was a very infrequent smoker and that Winston and Marlboro were popular cigarette brands in 1991. She had an opinion about whether her daughter would exit the freeway at I-696 and gone over a mile west to Mound Round. She also recalled the Gerald Gray distributed missing person flyers and that the flyer mistakenly indicated that Bernice's eyes were blue instead of hazel green.

St. Clair Shores Police Lieutenant Jack McFadzen testified that he spoke to gas station attendant Jeff Greggo the day before he appeared in court. When McFadzen asked him whether he saw Bernice on December 26, 1991, Greggo replied that it had been nine years and that he was probably mistaken. McFadzen also testified about sample routes that he drove to determine the logical stops a person might make in the area to buy cigarettes. A video of the drive was played for the jury. McFadzen also confirmed that he heard Petitioner make the "snitch" remark to Detective Troester on April 13, 2001.

Macomb County Sheriff's Sergeant Bechill testified that he spoke with Petitioner about his request for a single cell jail assignment because inmates were acting improperly. When Sergeant Bechill asked who was bothering him, Petitioner said that he wasn't a snitch and that he wasn't going to identify anyone. Bechill prepared a report of the incident in October, 1996. Bechill acknowledged that a snitch could be truthful or untruthful in communicating with authorities.

At the close of trial, the jury found Petitioner guilty of first-degree premeditated murder and possession of a firearm during the commission of a felony. The trial court sentenced him to life imprisonment without the possibility of parole on the murder conviction and a consecutive term of two years imprisonment on the felony firearm conviction.

Following sentencing, Petitioner filed a motion for new trial with the trial court, which was denied in 2006. Petitioner then filed an appeal of right with the Michigan Court of Appeals asserting

that:  (1) the trial court erred in admitting certain evidence, (2) the prosecution failed to present sufficient evidence to support his convictions, (3) the prosecutor committed misconduct, and (4) trial counsel was ineffective.  The Michigan Court of Appeals denied relief on those claims and affirmed Petitioner's convictions.  *People v. Pann*, No. 271013, 2007 WL 2683771 (Mich. Ct. App. Sept. 13, 2007) (unpublished).  Petitioner also filed an application for leave to appeal with the Michigan Supreme Court, which was denied in a standard order.  *People v. Pann*, 480 Mich. 1033, 743 N.W.2d 222 (2008).

Petitioner, through counsel, thereafter instituted this federal habeas action, essentially raising the same claims presented to the state courts on direct appeal of his convictions.  Respondent has filed an answer to the petition contending that it should be denied because the claims are barred by procedural default and/or lack merit.  Petitioner has filed a reply to that answer.

## III.   <u>Standard of Review</u>

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified 28 U.S.C. § 2241 *et seq.*, govern this case because Petitioner filed his petition after the AEDPA's effective date.  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  The AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002). "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694. However, "[i]n order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409. The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, _ U.S. _, 130 S. Ct. 1855, 1862 (2010) (quoting *Lindh*, 521 U.S. at 333, n. 7; *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).

The Supreme Court recently held that "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, _ U.S. _, 131 S. Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* ( citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003). Pursuant to § 2254(d), "a habeas court must

determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* Thus, in order to obtain habeas relief in federal court, a state prisoner must show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *See Williams*, 529 U.S. at 412; *see also Knowles v. Mirzayance*, _ U.S. _, 129 S. Ct. 1411, 1419 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam)); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 131 S. Ct. at 785. Furthermore, it "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16. While the requirements of "clearly established law" are to be determined solely by Supreme Court precedent, the decisions of lower federal courts may be useful in assessing the reasonableness of the state court's resolution of an issue. *See Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)); *Dickens v.*

*Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

A state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption only with clear and convincing evidence. *See Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, _ U.S. _, 131 S. Ct. 1388, 1398 (2011).

## IV.   Analysis

### A.   Evidentiary Claims

Petitioner first asserts that he is entitled to habeas relief because the trial court erred in admitting several pieces of evidence at trial. Specifically, Petitioner asserts that the trial court erred in admitting the following evidence: the victim's statements, the probate court judgment declaring her dead, other bad acts evidence, opinion testimony from police officers and the victim's mother, witness testimony about what the victim might do in a particular situation, and opinion testimony about Petitioner's use of the term "snitch." Respondent contends that certain claims are barred by procedural default and that all of the claims lack merit.

Alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). "Trial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action, unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth

24

Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (quoting *McGuire*, 502 U.S. at

69–70); *see Wynne v. Renico*, 606 F.3d 867, 871 (6th Cir. 2010) (citing *Bey v. Bagley*, 500 F.3d

514, 519-20 (6th Cir. 2007)); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

Accordingly, to the extent that Petitioner asserts that the trial court erred in admitting

testimony under the Michigan Rules of Evidence, he merely alleges violations of state law which

do not entitle him to federal habeas relief. *See, e.g., Wheeler v. Jones*, 59 F. App'x 23, 28 (6th Cir.

2003). State courts are the final arbiters of state law and the federal courts will not intervene in

such matters. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *see also Bradshaw v. Richey*, 546

U.S. 74, 76 (2005); *Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002).

### 1.    Victim's Statements

Petitioner asserts that the trial court erred in admitting victim Bernice Gray's statements to

certain individuals, including Monique Diederich, Sandra Dzwonik, Jean Ulmer, and Jane Richards,

regarding Petitioner's threats of violence. Petitioner alleges that the statements were inadmissible

hearsay and that their admission violated his confrontation rights. The Michigan Court of Appeals

denied relief on these claims finding that the statements were admissible under the Michigan Rules

of Evidence and finding that the confrontation argument was abandoned due to inadequate briefing.

*See Pann*, 2007 WL 2683771 at *1-2, n. 2.

The Michigan Court of Appeals' denial of relief is neither contrary to Supreme Court

precedent nor an unreasonable application thereof.[1]  Petitioner has not shown that the admission

of such testimony rendered his trial fundamentally unfair. As found by the Michigan Court of

---

[1]The Court notes that it would reach the same result under a *de novo* standard of review
as the Michigan Court of Appeals did not address the federal aspect of Petitioner's evidentiary
claims. The same is true for all of the evidentiary claims.

Appeals in reviewing the claims under state law, the victim's statements concerning Petitioner's threats to her were admissible under Michigan Rule of Evidence 803(a) to show her existing state of mind, the statements to Diedrich were also admissible under Michigan Rule of Evidence 803(2) as excited utterances, the statements to Ulmer were admissible as non-hearsay, and the application for housing assistance was admissible under Michigan Rule of Evidence 803(6) as a business record. Petitioner has not shown that the trial court's rulings were erroneous or that they deprived him of a fair trial.

Petitioner is also not entitled to relief on his claim that the admission of the statements violated his confrontation rights. The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ." U.S. CONST. AMEND. VI. The Confrontation Clause guarantees a criminal defendant the right to confront the witnesses against him. *See Davis v. Alaska*, 415 U.S. 308, 315 (1973). The Sixth Amendment protections are not so broad, however, as to exclude the admission of certain hearsay statements against a criminal defendant despite his or her inability to confront the declarant at trial. *See Maryland v. Craig*, 497 U.S. 836, 847-48 (1990).

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the testimonial statement of a witness who does not appear at trial is inadmissible unless the witness is unavailable to testify and the defendant has had a prior opportunity to cross-examine the witness. Testimonial statements include preliminary hearing testimony, grand jury testimony, prior trial testimony, and statements made during police interrogations. *Id.* at 54. Testimonial statements do not include remarks made to family members or acquaintances, business records, or statements made in furtherance of a conspiracy. *Id.* at 51-52, 56; *United States v. Martinez*, 430 F.3d 317, 328-29 (6th

26

Cir. 2005); *see also United States v. Stover*, 474 F.3d 904, 912-13 (6th Cir. 2007). The victim's statements to her friends, family members, and the housing authority were non-testimonial in nature. *Crawford* is thus inapplicable.

Moreover, the Supreme Court has made clear that the Confrontation Clause is not implicated, and need not be considered, when non-testimonial hearsay is at issue. *See Davis v. Washington*, 547 U.S. 813, 823-24 (2006); *see also Whorton v. Bockting*, 549 U.S. 406, 420 (2007) (noting that the Confrontation Clause "has no application to such statements and therefore permits their admission even if they lack indicia of reliability"); *Doan v. Carter*, 548 U.S. 449, 458 (6th Cir. 2008); *United States v. Arnold*, 486 F.3d 177, 192-93 (6th Cir. 2007) (en banc). Such is the case here. Petitioner has thus not shown that the admission of the challenged testimony violated his confrontation rights or otherwise rendered his trial fundamentally unfair. Habeas relief is not warranted on this claim.[2]

### 2.   Probate Court Judgment

Petitioner next asserts that the trial court erred in admitting the probate court judgment which declared that Bernice Gray died on Gordon Street in St. Clair Shores at 6:40 a.m. on December 26, 1991.[3] The Michigan Court of Appeals denied relief on this claim, finding that the probate court judgment was admissible under either Michigan Rule of Evidence 803(8) as a public record or under Michigan Rule of Evidence 803(9) as a vital statistic. The court also determined that the judgment was "explicitly made 'admissible' under MCL 600.2106, and constitutes 'prima

---

[2]Given this determination, the Court need not address the procedural default issue.

[3]Petitioner does not appear to contest the admission of Bernice Gray's death certificate, which contained similar information.

facie evidence . . . of all facts recited therein.' MCL 333.2886." *Pann*, 2007 WL 2683771 at *2.

The Michigan Court of Appeals' denial of relief is neither contrary to Supreme Court precedent nor an unreasonable application thereof. Petitioner has not shown that the admission of the probate court judgment violated his confrontation rights or rendered his trial fundamentally unfair. The probate court judgment was admitted as a public record and/or vital statistic. While the Supreme Court has not articulated a comprehensive definition of testimonial statements, it has provided examples of non-testimonial statements, which include business records. *See Crawford*, 541 U.S. at 56. Public records which exist prior to, and apart from, a criminal prosecution are akin to business records because they are not prepared for the purpose of criminal prosecution. Under *Crawford*, such public records are not themselves testimonial and their admission is not precluded by the Confrontation Clause. *See, e.g., United States v. Weiland*, 420 F.3d 1062, 1076-77 (9th Cir. 2005) (criminal judgment admissible to show defendant's prior convictions); *see also United States v. Watson*, _ F.3d _, 2011 WL 3568918 (8th Cir. Aug. 16, 2011) (penitentiary records containing booking photographs and fingerprint cards, used to prove defendant's status as a felon, were admissible as self-authenticating public records and did not violate the Confrontation Clause); *United States v. Caraballo*, 595 F.3d 1214, 1228-29 (11th Cir. 2010) (INS forms containing biographical information of illegal aliens are non-testimonial because they are routine forms done by agents); *United States v. Ballesteros-Selinger*, 454 F.3d 973, 975 (9th Cir. 2006) (immigration judge's deportation order is non-testimonial because it was not prepared in anticipation of future litigation). In *Melendez–Diaz v. Massachusetts*, 557 U.S. _, 129 S. Ct. 2527 (2009), the Supreme Court explained that business and public records are "generally admissible absent confrontation not because they qualify" under a hearsay exception, but because they are typically non-testimonial

28

statements, "having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some facts at trial." 129 S. Ct. at 2539–40.[4]

Such is the case here. The probate court judgment was entered during the ordinary course of the Macomb County Probate Court's governmental affairs in 1995 and was prepared to establish Bernice Gray's death and settle her estate. That civil judgment was not issued by the probate court for the purpose of proving any facts at Petitioner's criminal trial in 2001, or any other potential defendant's trial.[5] The probate court judgment was thus properly admitted as a public record and its admission did not violate the Confrontation Clause.

The admission of the probate court judgment also did not violate Petitioner's due process rights. Defense counsel discussed the different burdens of proof in civil and criminal proceedings and the trial court similarly instructed the jury. The trial court also instructed the jury on the appropriate burden of proof, the elements of the charged offenses, the jury's role in deciding the facts of the case, and the proper consideration of the evidence. Additionally, and perhaps most importantly, the witnesses who testified at the probate court hearing appeared at trial and were subject to questioning and cross-examination before the jury. The prosecution presented independent evidence and testimony as to Bernice's death and its time and location. Given such circumstances, the admission of the probate court judgment did not deprive Petitioner of a fundamentally fair trial.

---

[4]In *Melendez-Diaz,* the Supreme Court held that a forensic analyst certificate identifying a seized substance as cocaine was actually a testimonial affidavit requiring confrontation because it was made under oath for the purpose of establishing a fact at trial and an objective person would reasonably believe it to be used at trial. 129 S. Ct. at 2531-32.

[5]That the prosecutor may have hoped to use the judgment in a future criminal trial does not mean that the probate court issued it for such a purpose.

Furthermore, even if the trial court erred in admitting the probate court judgment, Petitioner is not entitled to relief because any such error was harmless. For purposes of federal habeas review, a constitutional error that implicates trial procedures is considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also Fry v. Pliler*, 551 U.S. 112, 117-18 (2007) (confirming that *Brecht* standard applies in "virtually all" habeas cases); *Ruelas v. Wolfenbarger*, 580 F.3d 403 (6th Cir. 2009) (ruling that *Brecht* is "always the test" in this circuit). Confrontation errors are subject to harmless error analysis. *See Delaware v. VanArsdall*, 475 U.S. 673, 684 (1986). As discussed *supra* and *infra*, the prosecution presented sufficient evidence, other than the probate court judgment, to establish the fact of Bernice Gray's death, as well as its time and location, as well as sufficient evidence, albeit circumstantial, to show that Petitioner committed the crime. Such evidence and the prosecution's witnesses were subject to challenge at trial. Moreover, the jury could have credited the probate court's judgment and acquitted Petitioner of the crime or, conversely, could have discredited the probate court's judgment and still convicted him. Given such circumstances, any error in admitting the probate court judgment was harmless beyond a reasonable doubt. Habeas relief is not warranted.

### 3.   Other Acts Evidence

Petitioner also asserts that the trial court erred in admitting other bad acts evidence, namely the assault upon his wife, Maureen Pann, but also Richard Ditchie's testimony about Bernice's appearance on his doorstep during the night in July or August, 1991. As to the admission of prior acts, the United States Supreme Court has declined to hold that similar "other acts" evidence is so extremely unfair that its admission violates fundamental conceptions of justice. *See Dowling v.*

30

*United States*, 493 U.S. 342, 352-53 (1990).[6]  Thus, "[t]here is no clearly established Supreme

Court precedent which holds that a state violates due process by permitting propensity evidence in

the form of other bad acts evidence." *Bugh*, 329 F.3d 496, 512 (6th Cir. 2003).  Consequently,

there is no Supreme Court precedent that the state court decisions could be deemed "contrary to"

under 28 U.S.C. § 2254(d)(1).  *Id.* at 513; *see also Adams v. Smith*, 280 F. Supp. 2d 704, 716 (E.D.

Mich. 2003).  Moreover, Petitioner's claim that the state trial court violated the Michigan Rules of

Evidence by admitting the other acts evidence is not cognizable on habeas review.  *See, e.g., Bey

v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007).[7]  Petitioner has thus failed to state a claim upon which

habeas relief may be granted as to this issue.

Furthermore, even if Petitioner states a cognizable claim, he is not entitled to relief.

Petitioner has not shown that the disputed evidence rendered his trial fundamentally unfair.  As

explained by the Michigan Court of Appeals in reviewing this issue under state law, the evidence

regarding the assault upon Maureen Pann was relevant and admissible on the issues of motive,

intent, plan, and modus operandi.  *See Pann*, 2007 WL 2683771 at *3.  Ditchie's testimony did not

reveal any act by Petitioner and Bernice's statements were admitted as excited utterances and

present sense impressions under state law.  *Id.*  Further, to the extent that Ditchie's testimony can

---

[6]While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.

[7]Petitioner also seems to assert that the admission of Maureen Pann's prior testimony was improper due to its testimonial nature.  There is no Confrontation Clause problem, however, because she was unavailable due to her invocation of her Fifth Amendment privilege, *see California v. Green*, 399 U.S. 149, 165-68 (1970), and Petitioner had a prior opportunity to cross-examine her (and in fact did so).  *See Crawford*, 541 U.S. at 68.

31

be viewed as other acts evidence, it was relevant to show motive and intent. Petitioner has not shown that the admission of the evidence was erroneous or, more importantly, that it rendered his trial fundamentally unfair. The state court's denial of relief was neither contrary to Supreme Court precedent nor an unreasonable application thereof. Habeas relief is not warranted.

### 4.   Opinion Testimony from Police and the Victim's Mother

Petitioner next asserts that the trial court erred in admitting opinion testimony from police and the victim's mother regarding their theories about the crime and the identity of the perpetrator. The Michigan Court of Appeals ruled that the testimony was proper and admissible under state law as expert and/or lay opinion testimony. *See Pann*, 2007 WL 2683771 at *3-4. This decision is neither contrary to Supreme Court precedent nor an unreasonable application thereof. First, Petitioner fails to cite any federal case establishing that the admission of opinion testimony offends fundamental principles of justice, and the Court is aware of none. Petitioner's allegation that the evidentiary rulings are "fundamentally unfair" and violate due process does not transform such state law issues into federal constitutional claims. *See, e.g., Petrucelli v. Coombe*, 735 F.2d 684, 688 (2d Cir. 1984) ("'Alleging lack of a fair trial does not convert every complaint about evidence or prosecutor's summation into a federal due process claim'") (citations omitted). There is generally no prohibition on a witness offering opinion testimony which goes to an ultimate issue in a case. Both the Federal and Michigan Rules of Evidence permit such testimony. *See* FED. R. EVID. 704(a); MICH. R. EVID. 704. Thus, there is no clearly established federal law as determined by the Supreme Court which suggests that the admission of such evidence violates the Constitution. *See Hopp v. Burt*, No. 03-10153, 2007 WL 162248, *9 (E.D. Mich. Jan. 16, 2007).

Second, Petitioner has not shown that the testimony was improper or that its admission

violated due process.  Under Michigan law at the time of Petitioner's trial, expert opinion testimony was admissible "if the court determines that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" and a witness can be "qualified as an expert by knowledge, skill, experience, training, or education." MICH. R. EVID. 702.  Lay opinion testimony is admissible if it is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."  MICH. R. EVID. 701.  The opinions and reliable conclusions of investigating police officers who have not been qualified as experts has also been deemed admissible under Michigan law when the testimony is based upon observations and is not dependent upon scientific expertise.  *See People v. Oliver*, 170 Mich. App. 38, 49-50, 427 N.W.2d 898 (1988).

In this case, Deputy Chief Troester's opinion that the victim was likely killed by someone she knew was based upon his police training and experience and was relevant to the factual issues in the case.  Jean Ulmer's opinion testimony that Petitioner buried the victim was based upon her perceptions and was helpful to a determination of the facts.  Detective Jenny's opinions about the case were based upon his police experience and his investigation of the case.  They were also first elicited by the defense.  It was proper to admit the various theories that he held, and the reasons for them, to assist the trier of fact in understanding his testimony and the other evidence at trial. Moreover, Jenny's testimony about Zarrick Butler's statement was admissible to show the basis for his expert opinion, not for the truth of the matter asserted.  The Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."  *Crawford*, 541 U.S. at 59, n. 9; *see also Tennessee v. Street*, 471 U.S. 409, 414 (1985)

33

("The nonhearsay aspect [of an out-of-court statement] . . . raises no Confrontation Clause concerns."); *United States v. Vassar*, 346 F. App'x 17, 24 (6th Cir. 2009) (citing *Crawford* and *Tennessee* in rejecting confrontation claim arising from use of recorded statement which was not offered to prove truth of matter asserted), *cert. denied*, 130 U.S. 3343 (2010); *Wheeler v. Jones*, 59 F. App'x at 29 (pre-*Crawford* case). Lastly, the trial court properly instructed the jury about the consideration of the opinion and expert testimony. Petitioner has failed to meet his burden of showing that the admission of the opinion testimony deprived him of a fundamentally unfair trial or otherwise violated his constitutional rights. *See, e.g., Rhodus v. Berghuis*, No. 07-CV-15009, 2010 WL 4260092, *8-9 (E.D. Mich. Oct. 22, 2010 ) (denying habeas relief on similar claim). Habeas relief is not warranted.

5.   <u>Testimony about the Victim's Likely Conduct</u>

Petitioner relatedly asserts that the trial court erred in admitting witness opinion testimony about what the victim might do in certain situations, *e.g.*, whether she would associate with a stranger or voluntarily abandon her daughter. The Michigan Court of Appeals ruled that such testimony was properly admitted as lay opinion testimony under state evidentiary rules. *See Pann*, 2007 2683771 at *4-5. This decision is neither contrary to Supreme Court precedent nor an unreasonable application thereof. The testimony was admissible because the witnesses testified based upon their experiences and their knowledge of the victim, and their opinions were relevant to the facts at issue in the case. *See* Mich. R. Evid. 701. Petitioner was free to argue that their opinions were speculative or wrong, but such criticisms go to the weight, rather than the admissibility, of the evidence. Petitioner has not shown that the admission of this opinion testimony rendered his trial fundamentally unfair. Habeas relief is not warranted on this claim.

34

6.     Opinion Testimony about the Term "Snitch"

Lastly, Petitioner asserts that the trial court erred in admitting Deputy Chief Troester's opinion testimony about what Petitioner meant when he asked who had "snitched" on him.  The Michigan Court of Appeals ruled that the testimony was proper and admissible under state law as expert opinion testimony.  *See Pann*, 2007 WL 2683771 at *4.  The testimony was admissible under state law because the witnesses testified based upon his police experience and his opinion was relevant to the facts, *i.e.* an admission or consciousness of guilt.  *See* MICH. R. EVID. 704. Petitioner was free to argue that the witness's opinion was invalid.  In fact, the defense presented a witness, criminal defense attorney Brian Legghio, to provide a contrary opinion as to the meaning of "snitch" and how the jury should evaluate the remark.  The jury was also instructed about the proper consideration of expert, lay opinion, and police testimony.  Given such circumstances, it cannot be said that the admission of this testimony rendered Petitioner's trial fundamentally unfair. Habeas relief is not warranted on this claim.

**B.     Insufficient Evidence Claim**

Petitioner next asserts that he is entitled to habeas relief because the prosecution presented insufficient evidence to support his convictions.  In particular, Petitioner cites the lack of physical evidence linking him to the crime and criticizes the circumstantial evidence presented at trial. Respondent contends that this claim lacks merit.

The Federal Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  The standard of review for a sufficiency of the evidence challenge must focus on whether "after viewing the evidence in the light most

35

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). "The *Jackson* standard must be applied 'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (quoting *Jackson*, 443 U.S. at 324 n. 16).

A federal habeas court must view this standard through the framework of 28 U.S.C. § 2254(d). *See Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002). Thus, under the AEDPA, challenges to the sufficiency of the evidence "must survive two layers of deference to groups who might view facts differently" than a reviewing court on habeas review – the factfinder at trial and the state court on appellate review – as long as those determinations are reasonable. *See Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009), *cert. den.* _ U.S. _, 130 S. Ct. 1081 (2010). "A reviewing court does not re-weigh the evidence or re-determine the credibility of the witnesses whose demeanor has been observed by the trial court." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). Accordingly, "[t]he mere existence of sufficient evidence to convict . . . defeats a petitioner's claim." *Matthews*, 319 F.3d at 788-89.

Under Michigan law, first-degree premeditated murder requires proof that the defendant intentionally killed the victim and that the killing was premeditated and deliberate. *See People v. Kelly*, 231 Mich. App. 627, 642, 588 N.W.2d 480 (1998); MICH. COMP. LAWS § 750.316. Premeditation and deliberation may be established by evidence showing: "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *People v. Schollaert*, 194 Mich. App.

36

158, 170, 486 N.W.2d 312 (1992); *see also People v. Abraham*, 234 Mich. App. 640, 656, 599 N.W.2d 736 (1999).  The elements of felony firearm are that the defendant possessed a firearm during the commission of, or the attempt to commit, a felony.  *See People v. Akins*, 259 Mich. App. 545, 554, 675 N.W.2d 863 (2003) (citing *People v. Avant*, 235 Mich. App. 499, 505, 597 N.W.2d 864 (1999)); MICH. COMP. LAWS § 750.227b.

The prosecution must prove beyond a reasonable doubt that the defendant committed the charged offense.  *See, e.g., People v. Kern*, 6 Mich. App. 406, 409, 149 N.W.2d 216 (1967).  In other words, "proof of [the] defendant's connection with the alleged offense is an indispensable element of [the prosecutor's] duty." *Id.*  Direct or circumstantial evidence and reasonable inferences arising from that evidence may constitute satisfactory proof of the elements of an offense, *see People v. Jolly*, 442 Mich. 458, 466, 502 N.W.2d 177 (1993), including the identity of the perpetrator, *see Dell v. Straub*, 194 F. Supp. 2d 629, 647 (E.D. Mich. 2002); *Kern*, 6 Mich. App. at 409, 149 N.W.2d 216; *see also People v. Johnson*, 146 Mich. App. 429, 434, 381 N.W.2d 740, 742 (1985), and the defendant's intent or state of mind.  *See People v. Dumas*, 454 Mich. 390, 398, 563 N.W.2d 31 (1997); *see also People v. Nowack*, 462 Mich. 392, 402–403, 614 N.W.2d 78 (2000).

Applying the *Jackson* standard, the Michigan Court of Appeals ruled that the prosecution presented sufficient evidence to support the jury's guilty verdict.  The court explained:

> In this case, the evidence showed that in July or August 1991 the victim ran out of defendant's home, scantily clad, and told a neighbor, Ditchie, not to call the police unless "he" came out. The victim amended an application for housing assistance in 1991, to state that she was moving out of her current residence due to violence in the home. When looking for a home, she remarked that she would need bars on the windows.
>
> The victim moved out of defendant's home in mid-December 1991. Shortly

37

thereafter, on Christmas Eve, defendant proposed marriage to the victim, but she turned down his proposal and told defendant that she wanted to date other men. Defendant threatened to kill her, and assured her that there would be no dispute concerning custody of their daughter. That night, defendant was observed "casing" the home of the victim's babysitter.

On Christmas day, defendant made a date with the victim for a New Year's Eve concert, but then angrily left the victim's mother's home when the victim either rejected his sexual advances or told him not to count on her going home with him on New Year's Eve.

The following day, the victim brought her child to daycare at 6:20 or 6:25 a.m., and a neighbor heard a gunshot at approximately 6:30 a.m. The victim did not appear for work that morning. Defendant was not very helpful in looking for her. Instead, he returned the engagement ring (tracking mud into the jewelry store with his shoes), may have gone to a building supply store, picked up his helper, and worked on a basement repair until approximately 3:30 p.m. Defendant did not return the victim's family's calls until approximately 9:45 p.m. He looked very tired and drawn out, and explained that he had been digging all day, and then went shopping. Although witnesses could account for defendant's whereabouts for much of the day, his whereabouts between 3:30 and 9:45 p.m. could not be accounted for. While the family was looking through the victim's belongings, defendant took a signed affidavit of parentage, which he then filed on December 30, 1991.

The victim's car was found on December 30, 1991, in an area of Detroit known to defendant. A .25 caliber bullet and two spent shell casings were found inside the car. Blood in the car was consistent with the victim having been shot in the head, slumping forward, and then either falling or being pushed to the passenger side, enabling someone to get in and drive the vehicle away. The victim's body was never found and she was declared dead in 1995.

Defendant owned or leased various storage yards, and owned rental properties in the area where the victim's car was found. Defendant also owned construction equipment, and had excavating expertise.

Several years later, in 1996, defendant's wife moved out of the home and defendant threatened to kill her. Defendant hid in the back seat of her car and assaulted her while she was driving. He attempted to strangle her, and hit her repeatedly, telling her that she was going to die. When the police arrived, defendant sped away, causing a crash that injured his wife and a third party.

In the past, defendant had commented that someone he knew had gotten away with murdering his wife by getting rid of the body, and that the police could not prove a murder without a body. When defendant was finally arrested, in 2000, he asked

38

who had "snitched" on him.

Viewed in a light most favorable to the prosecution, the foregoing evidence was sufficient to enable a rational jury to find, beyond a reasonable doubt, that defendant intentionally shot and killed the victim, with premeditation and deliberation, because their relationship had become strained and she wanted to begin seeing other men, and that he disposed of the victim's body, believing that he could not be caught if no body was found.

*Pann*, 2007 WL 2683771 at *6-7.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. Although the evidence against Petitioner was circumstantial, taken together it was sufficient to support his convictions. *See, e.g., Britt v. Howes*, No. 09-1597, 2010 WL 5135618, *3 (6th Cir. Dec.16, 2010) (unpublished) (confirming that circumstantial evidence alone is sufficient to sustain a conviction and denying habeas relief); *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006) (direct appeal case ruling that circumstantial evidence can be sufficient to sustain a conviction and stating that such evidence "need not remove every reasonable hypothesis except that of guilt"). The testimony about Petitioner's threats to Bernice after she moved out and rejected his marriage proposal, Bernice's housing application, Petitioner's remarks about committing the perfect crime, Mary Grillo's identification of Petitioner as the man she saw casing the daycare provider's home, Gary Chupailo's testimony about hearing a gunshot in the area, the timing of the shooting, the contents and location of Bernice's car when found, Petitioner's actions in returning the engagement ring, obtaining the affidavit of parentage, and not taking steps to search for Bernice shortly after disappearance, his "snitch" remark, his assault upon Maureen Pann, and his motive and opportunity to commit the crime provided sufficient, albeit circumstantial, evidence of his guilt.

Petitioner essentially challenges the inferences the jury drew from the testimony at trial.

39

However, it is the job of the fact-finder at trial, not a federal habeas court, to resolve evidentiary conflicts. *See Jackson*, 443 U.S. at 326; *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002); *Walker v. Engle*, 703 F.2d 959, 969-70 (6th Cir. 1983) ("A federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."). The jury's verdict, and the Michigan Court of Appeals' decision affirming that verdict, were reasonable. The trial testimony and evidence, viewed in a light most favorable to the prosecution, established beyond a reasonable doubt that Petitioner committed the charged offenses and that he possessed the requisite intent to support his convictions. More importantly, for purposes of habeas review, this Court cannot say that the Michigan Court of Appeals' ruling to that effect was unreasonable. Habeas relief is not warranted on this claim.

### C.    Prosecutorial Misconduct Claims

Petitioner next asserts that he is entitled to habeas relief because the prosecutor engaged in misconduct. Specifically, he claims that the prosecutor shifted the burden of proof, argued facts not in evidence, misstated the testimony, made improper character arguments, and advocated for jury deference to the opinion of police officers and judges. Respondent contends that these claims are barred by procedural default and/or lack merit.

The United States Supreme Court has stated that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). To prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's remarks "so infected the trial with unfairness as to make the resulting

conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).

The United States Court of Appeals for the Sixth Circuit has adopted a two-part test for determining whether prosecutorial misconduct violates a defendant's due process rights. *See Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002) (citing cases). First, the court must determine whether the challenged statements were indeed improper. *Id.* at 452. Upon a finding of impropriety, the court must decide whether the statements were flagrant. *Id.* Flagrancy is determined by an examination of four factors: 1) whether the statements tended to mislead the jury or prejudice the accused; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before a jury; and 4) the total strength of the evidence against the accused. *Id.*; *see also Boyle v. Milton*, 201 F.3d 711, 716 (6th Cir. 2000) (citing *United States v. Francis*, 170 F.3d 546, 540-550 (6th Cir. 1999)). "[T]o constitute the denial of a fair trial, prosecutorial misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial,' or 'so gross as probably to prejudice the defendant.'" *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (citations omitted).

### 1.   Shifting the Burden of Proof

Petitioner first asserts that the prosecutor engaged in misconduct by shifting the burden of proof when he stated that there was no evidence establishing Petitioner's whereabouts after the basement wall repair job on December 26, 1991. It is well-settled that a prosecutor may not shift the burden of proof to a defendant. *See, e.g., United States v. Clark*, 982 F.2d 965, 968-69 (6th Cir.1993). A prosecutor may, however, highlight inconsistencies or inadequacies in the defense, *see Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005), and point out the lack of evidence supporting the defense theory. *See United States v. Forrest*, 402 F.3d 678, 686 (6th Cir. 2005).

41

In this case, the Michigan Court of Appeals found that the prosecutor's comments were appropriate to refute the defense claim that Petitioner was working and shopping that day and did not commit the crime. *See Pann*, 2007 WL 2683771 at \*7. This decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. The prosecutor's argument was based upon the evidence presented at trial and was intended to rebut the defense theory of the case. The prosecutor did not shift the burden of proof to the defense. Moreover, the trial court properly instructed the jury that Petitioner was innocent until proven guilty and that the prosecution bore the burden of proving guilt beyond a reasonable doubt. Jurors are presumed to follow the court's instructions. *See Penry v. Johnson*, 532 U.S. 782, 799 (2001) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)); *United States v. Powell*, 469 U.S. 57, 66 (1984) ("Jurors . . . take an oath to follow the law as charged, and they are expected to follow it."). Petitioner has not shown that the prosecutor's argument rendered his trial fundamentally unfair.

Petitioner relatedly asserts that the prosecutor's statements were false because Petitioner had given an account of his whereabouts to the victim's mother and the police had seized a receipt from a building supply store called Sabatini's which showed that he purchased supplies around noon on December 26, 1991. The prosecutor, however, was entitled to argue that there was no evidence of Petitioner's whereabouts, other than his own statements, admitted at trial. Moreover, there was no testimony or other evidence establishing his whereabouts during the critical time periods from 6:30 to 8:30 a.m. and 3:30 to 9:30 p.m. on December 26, 1991. The building supply receipt was not presented at trial and did not provide an alibi for the relevant time periods. Petitioner has not shown that the prosecutor erred or, in any event, that any error was so prejudicial or flagrant as to deprive him of a fundamentally fair trial. Habeas relief is not warranted on this

42

claim.

### 2.    Arguing Facts Not in Evidence

Petitioner next asserts that the prosecutor engaged in misconduct by arguing facts not in evidence by stating, while questioning two witnesses, that Petitioner had buried the victim's body 26 feet below ground.  It is well-settled that a prosecutor may not misstate the evidence or assume the existence of prejudicial facts not in evidence.  *See Donnelly*, 416 U.S. at 646; *Darden v. Wainwright*, 477 U.S. 168, 182 (1986); *Hodge v. Hurley*, 426 F.3d 368, 380-81 (6th Cir. 2005).

The Michigan Court of Appeals denied relief on this claim because the trial court sustained defense counsel's objections to the remarks and the prosecutor did not reference a 26-foot burial during closing arguments.  *See Pann*, 2007 WL 2683771 at *8.  This decision is neither contrary to Supreme Court precedent nor an unreasonable application thereof.  The prosecutor's reference, while perhaps improper, was isolated in nature and was not misleading or prejudicial given the trial court's immediate curative action and subsequent jury instruction that the attorneys' arguments are not evidence.  Petitioner has not shown that the prosecutor's conduct deprived him of a fundamentally fair trial.  Habeas relief is not warranted on this claim.

### 3.    Misstating Testimony

Petitioner next asserts that the prosecutor engaged in misconduct by misstating the testimony when he claimed during closing arguments that Mary Grillo had positively identified Petitioner as the man she saw near the daycare provider's home during the evening on December 24, 1991.  As noted, a prosecutor may not misstate the evidence.  *See Donnelly*, 416 U.S. at 646; *Darden*, 477 U.S. at 182; *Hodge*, 426 F.3d at 380-81.

The Michigan Court of Appeals denied relief on this claim finding that there was conflicting

43

testimony about the certainty of Grillo's identification and that the prosecutor's argument was based upon a reasonable inference from the trial testimony. *See Pann*, 2007 WL 2683771 at *8. This decision is neither contrary to Supreme Court precedent nor an unreasonable application thereof.   It is well-settled that a prosecutor has leeway to argue the evidence and reasonable inferences therefrom. *See Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000).  The prosecutor's argument about Grillo's identification was appropriate and did not deprive Petitioner of a fair trial. Habeas relief is not warranted on this claim.

### 4.   Making Improper Character Arguments

Petitioner next asserts that the prosecutor engaged in misconduct by making improper character arguments.  The Michigan Court of Appeals denied relief on this claim finding that the prosecutor's argument about the similarities between this case and Maureen Pann's assault was a permissible comment on the evidence and that the prosecutor's statements that Petitioner was capable of ambushing a woman and making the "no body, no crime" comment were proper responses to defense counsel's arguments to the contrary. *See Pann*, 2007 WL 2683771 at *9.  The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.  The prosecutor's remarks were appropriate comments on the evidence and/or were intended to rebut defense counsel's arguments.  While perhaps inartfully worded, the statements were not so flagrant as to deny Petitioner a fair trial.  Moreover, the trial court instructed the jury about the proper consideration of such evidence.   Given such circumstances, Petitioner has not shown that the prosecutor's arguments rendered his trial fundamentally unfair.  Habeas relief is not warranted on this claim.

5.        Advocating Deference to Judicial and Police Opinions

Lastly, Petitioner asserts that the prosecutor engaged in misconduct by arguing that the jurors should defer to the opinions of the probate court judge and the testifying police officers. The Michigan Court of Appeals denied relief on this claim finding that the probate court judgment was admissible as prima facie evidence of the facts contained therein and that the prosecutor merely argued his theory of the case and responded to defense counsel's arguments challenging the police officers' testimony. *See Pann*, 2007 WL 2683771 at *9.

The state court decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. The trial court (and the Michigan Court of Appeals) determined that such evidence was relevant and admissible under state law. The prosecutor was thus entitled to rely on the probate court judgment as prima facie evidence that Bernice Gray died by accident or disaster (including homicide) at 6:40 a.m. on December 26, 1991 on Gordon Street in St. Clair Shores, Michigan. It is not prosecutorial misconduct for a prosecutor to offer and rely upon evidence which is deemed admissible by the trial court. *See Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008); *Sweet v. Delo*, 125 F.3d 1144, 1154 (8th Cir. 1997); *Moore v. Stovall*, No. 06-CV-14824, 2008 WL 2547418, *3 (E.D. Mich. June 20, 2008) (habeas petitioner could not establish that the prosecutor's use of properly admitted testimony constituted misconduct). The prosecutor did not urge the jurors to abdicate their fact-finding responsibilities, but asked them to rely upon the judgment as allowed by law. Moreover, the trial court instructed the jury about the different burdens of proof in civil and criminal proceedings and the proper consideration of the evidence. The prosecutor also properly commented on the police officers' testimony. It is well-established that a prosecutor may argue from the facts that a witness is (or is not) worthy of belief.

45

*See Portuondo v. Agard*, 529 U.S. 61, 69 (2000). In this case, the prosecutor argued from the evidence that the police officers' opinions were logical and should be credited and responded to contrary arguments raised by defense counsel. The prosecutor's argument was proper and did not deprive Petitioner of a fundamentally fair trial. Habeas relief is not warranted on this claim.[8]

### D.      Ineffective Assistance of Counsel Claims

Lastly, Petitioner asserts that he is entitled to habeas relief because trial counsel was ineffective for failing to investigate and call witnesses, failing to introduce evidence from auto repair shops and the arresting/booking police officer, failing to have the victim's blood tested for drugs, failing to properly cross-examine the medical examiner and two police officers, failing to present a counter-theory of what happened to the victim, failing to call the probate judge to testify, and failing to object to some of the alleged prosecutorial misconduct. Respondent contends that these claims lack merit.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court set forth a two-prong test for determining whether a habeas petitioner has received the ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. Second, the petitioner must establish that counsel's deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal. *Id.*

As to the performance prong, a petitioner must identify acts that were "outside the wide

---

[8]Given the Court's ruling denying relief on the merits of Petitioner's prosecutorial misconduct claims, it need not address the issue of procedural default.

46

range of professionally competent assistance" in order to prove deficient performance. *Id.* at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. *Id.* at 689. Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690. The petitioner bears the burden of overcoming the presumption that the challenged actions were sound trial strategy. *Id.* at 689.

To satisfy the prejudice prong under *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id.* "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

The Supreme Court has recently confirmed that a federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 131 S. Ct. at 788 (internal and end citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard. *Id*. at 788.

1. <u>Failing to Interview and Call Witnesses</u>

Petitioner first asserts that trial counsel was ineffective for failing to interview and call

47

witnesses who would have testified that they saw someone resembling the victim and/or her car after 6:40 a.m. on December 26, 1991. Well-established federal law requires that defense counsel conduct a reasonable investigation into the facts of a defendant's case, or to make a reasonable determination that such investigation is unnecessary. *See Wiggins*, 539 U.S. at 522-23; *Strickland*, 466 U.S. at 691; *Stewart v Wolfenbarger*, 468 F.3d 338, 356 (6th Cir. 2007); *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). "American Bar Association standards ... also mandate counsel's duty to investigate all leads relevant to the merits of the case." *Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir. 1987); *see also Rompilla v. Beard*, 543 U.S. 374, 387 (2005) (noting that the ABA standards provide guidance for determining the reasonableness of counsel's conduct). The duty to investigate "includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns*, 395 F.3d 251 at 258. "A purportedly strategic decision is not objectively reasonable when the attorney has failed to investigate his options and make a reasonable choice between them." *Id*. (quoting *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991)); *see also Wiggins*, 539 U.S. at 526.

Decisions as to what evidence to present and whether to call certain witnesses, however, are generally presumed to be a matter of trial strategy. The failure to call witnesses or present other evidence constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense. *See Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002). When making strategic decisions, counsel's conduct must be reasonable. *See Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *see also Wiggins*, 539 U.S. at 522-23.

Applying the *Strickland* standard, the Michigan Court of Appeals denied relief on this claim

48

finding that Petitioner had failed to establish that he was deprived of a substantial defense.  The court explained:

> In support of his motion for a new trial, defendant submitted several police reports that identified people who claimed to have seen someone who looked like the victim, or a car similar to hers, in Detroit, Pontiac, and Grand Rapids. According to the police reports, one of these sightings occurred on December 26, 1991, at 9:00 or 9:30 a.m., another occurred on January 3, 1992, and the others took place on December 28, 1991. However, the four sightings of the victim's car took place after her car was observed abandoned on Eastlawn Street. The purported sightings of the victim in Pontiac (at an AA meeting), and in Grand Rapids (hitchhiking and flagging down cars), were of suspect reliability. There was also a claimed sighting of the victim sitting in her car, on December 26, 1991, at 9:30 a.m., parked on I-696, just east of the Southfield Road exit. However, this report was also suspect because, by then, her mother had already driven on that freeway looking for the victim and her car. Defendant has failed to show that defense counsel's failure to investigate these questionable reports or call the witnesses deprived him of a substantial defense.

*Pann*, 2007 WL 2683771 at *10.

This decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.  First, Petitioner has not shown that trial counsel was deficient.  Counsel had access to the police reports and may have reasonably determined that further investigation was unnecessary due to the location and/or timing of the sightings.  Moreover, counsel did produce one witness, gas station attendant Jeff Greggo, who testified that he saw the victim buy cigarettes that morning in an area where should could have traveled.  Trial counsel's decisions are entitled to a significant measure of deference.  As the Supreme Court has recently stated, "[t]here comes a point where a defense attorney will reasonably decide that another strategy is in order, thus making particular investigations unnecessary. . . .Those decisions are due a heavy measure of deference."  *Cullen v. Pinholster*, _ U.S. _, 131 S. Ct. 1388, 1407 (2011) (reversing grant of habeas relief on ineffective assistance of counsel claim) (citations omitted).  Moreover,

even if counsel was deficient, Petitioner has not shown that he was deprived of a substantial defense or otherwise prejudiced by counsel's failure to interview or present the witnesses at issue. The victim sightings in Pontiac, Grand Rapids, and on I-696 were of questionable reliability and the car sightings occurred after the victim's abandoned car was seen and/or found on Eastlawn Street in Detroit. Presenting such suspect testimony would not have benefitted the defense and could have undermined the credibility of trial counsel and the defense case. Habeas relief is therefore not warranted on this claim.

### 2.   Failing to Introduce Evidence from Auto Repair Shops and Police Officer

Petitioner also asserts that trial counsel was ineffective for failing to introduce evidence from local auto repair shops about car backfires, from neighbors who did not hear any gunshots, and from an Officer Rice that the "snitch" remark was fabricated or distorted. The Michigan Court of Appeals denied relief on this claim, essentially finding that Petitioner had failed to substantiate his claims. *See Pann*, 2683771 at *10-11. This decision is neither contrary to Supreme Court precedent nor an unreasonable application thereof. Petitioner has not presented witness affidavits or other evidence to support these claims. Conclusory allegations, without evidentiary support, are insufficient to warrant habeas relief. *See Cross v. Stovall*, 238 F. App'x 32, 39-40 (6th Cir. 2007); *Prince v. Straub*, 78 F. App'x 440, 442 (6th Cir. 2003); *Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998) (conclusory allegations of ineffective assistance of counsel do not justify federal habeas relief); *see also Washington v. Renico*, 455 F.3d 722, 733 (6th Cir. 2006) (bald assertions and conclusory allegations do not provide sufficient basis to hold an evidentiary hearing in habeas proceedings). Petitioner has thus failed to establish that trial counsel erred or that he was prejudiced by counsel's conduct. Habeas relief is not warranted on this claim.

50

### 3.   Failing to Seek Drug-Testing of the Victim's Blood

Petitioner next asserts that trial counsel was ineffective for failing to have the victim's blood tested for drugs to show that her disappearance was understandable and to be expected given the lifestyle of drug users.  The Michigan Court of Appeals denied relief on this claim finding that the record contained no support for Petitioner's claim that Bernice Gray used drugs or that the disappearance and murder of a drug user would be understandable or expected.  The court also found that counsel may have reasonably decided that attacking the victim would have alienated the jury and raised questions about Petitioner's possible drug use.  *See Pann*, 2007 WL 2683771 at *11. The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.  Petitioner's claims about the victim's drug use are speculative and conclusory and do not warrant habeas relief.  *See Cross*, 238 F. App'x at 39-40; *Workman*, 178 F.3d at 771.  Additionally, trial counsel may have reasonably determined that attacking the victim would be poor trial strategy and would not benefit the defense case.  Petitioner has failed to establish that counsel erred or that he was prejudiced by counsel's conduct.  Habeas relief is not warranted on this claim.

### 4.   Failing to Properly Question the Medical Examiner and Police Officers

Petitioner also asserts that trial counsel was ineffective for failing to properly cross-examine the medical examiner and two police officers.  The Michigan Court of Appeals denied relief on this claim finding that the questioning of witnesses was a matter of trial strategy and that Petitioner had failed to establish that trial counsel was ineffective.  *See Pann*, 2007 WL 2683771 at *11.  This decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.  The record reveals that trial counsel cross-examined Dr. Spitz about his findings

and opinions and later recalled him as a defense witness to testify that he could not determine when the victim died without her body.   The record similarly reveals that trial counsel cross-examined Deputy Chief Troester and Detective Jenny about their investigations and opinions about the case. While Petitioner believes that additional questions should have been asked, he has not shown that such inquiry would have benefitted his defense or affected the outcome at trial.  Counsel's cross-examination of the witnesses, while perhaps not perfect, was within the realm of reasonable conduct and professional representation.  Petitioner has not shown that counsel was ineffective under the *Strickland* standard.  Habeas relief is not warranted on this claim.

5.      Failing to Offer a Counter-Theory of Events

Petitioner also asserts that trial counsel was ineffective for failing to offer a counter-theory of what happened to Bernice Gray, such as presenting information about robberies or sexually-motivated abductions.  The Michigan Court of Appeals denied relief on this claim finding that the record contained no evidence of such matters and that counsel may have reasonably determined that attempting to prove an alternate theory would have been difficult and not sound trial strategy.  *See Pann*, 2007 WL 2683771 at *11.  This decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.   Petitioner's allegations are again conclusory and unsupported by the record before this Court.   Additionally, given that counsel's strategy was to challenge the lack of physical evidence linking Petitioner to the crime and to instill reasonable doubt into the proceedings, counsel may have reasonably decided that offering one particular counter-theory of events would not benefit the defense.  Counsel's trial strategy was reasonable.  The fact that counsel's strategy was ultimately unsuccessful does not mean that he was ineffective.   *See Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002) ("an

52

ineffective-assistance-of-counsel claim cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken"). Habeas relief is not warranted on this claim.

### 6.   Failing to Call the Probate Judge to Testify

Petitioner next asserts that trial counsel was ineffective for failing to call the probate judge to testify about the deficiencies in the probate court proceedings. The Michigan Court of Appeals denied relief on this claim finding that the probate court judgment was admissible, that counsel cross-examined witnesses about their probate court testimony, and that Petitioner had failed to establish that he was deprived of a substantial defense. *See Pann*, 2007 WL 2683771 at *11. The Michigan Court of Appeals' decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. First, trial counsel exhibited a reasonable trial strategy relative to the probate court judgment by seeking to exclude it initially, cross-examining the relevant witnesses about their probate court testimony once the judgment was admitted, and arguing the different burdens of proof between the civil and criminal proceedings. Second, Petitioner has failed to demonstrate that he was deprived of a substantial defense or otherwise prejudiced by counsel's conduct. He had not submitted an affidavit from the probate court judge or other evidence to support this claim, and his conclusory allegations are insufficient to warrant habeas relief. Petitioner has thus failed to establish that counsel erred or that he was prejudiced by counsel's conduct in this regard. Habeas relief is not warranted on this claim.

### 7.   Failing to Object to Alleged Prosecutorial Misconduct

Lastly, Petitioner asserts that trial counsel was ineffective for failing to object to several of the alleged instances of prosecutorial misconduct. The Michigan Court of Appeals denied relief on this claim finding that Petitioner could not establish that he was prejudiced by counsel's conduct

because his prosecutorial misconduct claims lack merit. *See Pann*, 2007 WL 2683771 at *12. This Court agrees. Defense counsel cannot be deemed ineffective for failing to make a futile motion or objection. *See McQueen*, 99 F.3d at 1316. Given the state court and this Court's determination that the prosecutor did not engage in misconduct warranting relief, Petitioner cannot establish that counsel was ineffective under the *Strickland* standard. Habeas relief is not warranted on this claim.

## V.   **Conclusion**

For the reasons stated, the Court concludes that Petitioner is not entitled to federal habeas relief on the claims contained his petition and that the petition for a writ of habeas corpus must be denied and dismissed with prejudice.

Before Petitioner may appeal the Court's decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court denies a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, a court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merits. *Id*. at 336-37. Having conducted the requisite review, the Court concludes that Petitioner has failed to make a substantial showing of the denial of a constitutional right as to his habeas claims. A certificate of appealability is not warranted.

54

Accordingly;

**IT IS ORDERED** that the petition for a writ of habeas corpus is **DENIED** and

**DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.


                                        s/John Corbett O'Meara
                                        United States District Judge

Date:  September 29, 2011




        I hereby certify that a copy of the foregoing document was served upon counsel of record
on this date, September 29, 2011, using the ECF system.


                                        s/William Barkholz
                                        Case Manager